**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

**No. 99-50987**

**CHEVRON USA, INC.,**

Plaintiff - Appellee-Cross-Appellant,

**VERSUS**

**GPM GAS CORPORATION,**

Defendant - Appellant-Cross-Appellee.

Appeals from the United States District Court
For the Western District of Texas
(MO-97-CV-199)

June 1, 2001

Before POLITZ, DeMOSS, and STEWART, Circuit Judges.

PER CURIAM:[*]

**I.**

Appellant GPM Gas Corporation ("GPM") seeks to reverse the final judgment of the district court on Appellee/Cross-Appellant Chevron's breach of contract suit. The three contracts at issue in

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

the case were for the purchase of Chevron's casinghead gas[2], and each contained a favored nations clause ("FNC") which Chevron alleged was violated by GPM. Following a bench trial, the district court, Judge Lucius D. Bunton, III presiding, found in favor of Chevron and awarded damages in the amount of approximately $13.8 million, plus interest and fees. Both parties appeal various aspects of the judgment. We affirm.

## II.

This case involves a contract dispute between Chevron, the current successor in interest of Gulf Oil Corporation and Pure Oil Corporation (the seller under the contracts), and GPM, the current successor in interest of Phillips 66 Natural Gas Company(the buyer under the contracts). In November 1961, Chevron's two predecessors (Gulf and Pure) entered into three contracts to sell casinghead gas to Phillips (GPM's predecessor).

The first contract between Pure and Phillips covered land in Ector County, Texas, in the Goldsmith San Andres Unit ("the GSAU Tract 1 contract"). The second contract between Gulf and Phillips covered certain other lands in the same area known as GSAU Tracts 2 and 3 ("the GSAU Tracts 2 and 3 contract). These first two contracts are collectively referred to as the GSAU contracts.

---

[2] Casinghead gas is defined as "gas issuing from wells, produced from the same sand or strata which the oil is produced or as the result of the induction of gas by any method for facilitating or increasing the production of oil, and gas vaporized from oil after production."

2

The third contract between Gulf and Phillips covered land in Crane and Upton Counties, Texas, comprising 21 McElroy and other leases ("the McElroy contract"). The McElroy contract originally dealt with 21 leases, 5 of which later comprised the Adamc-Devonian Unit. Seven amendments to the McElroy contract added acreage to it. All of these leases, excluding the 5 that later became Adamc, are collectively referred to as the McElroy leases. The GSAU contracts and the McElroy contract are collectively referred to as "the contracts."

Each of the three contracts at issue contained a provision identified as a favored nations clause ("FNC") which provided as follows:

> 18. FAVORED NATIONS - If at any time fifty percent (50%) or more of the casinghead gas purchased by Buyer and processed by Buyer in its Goldsmith Gasoline plant is being purchased by Buyer under a casinghead gas contract or contracts which produce higher prices for casinghead gas than the prices payable to Seller hereunder, quality of gas and conditions of delivery considered, then Seller shall have and is hereby granted the option to sell to Buyer, all casinghead gas covered by this contract under the terms of such other contract or contracts in lieu hereof by so notifying Buyer in writing within sixty (60) days from receipt by Seller from Buyer of notice of the existence of such other casinghead gas contract, provided that failure to exercise such option, within such time and in such manner, shall terminate such option. Buyer shall notify seller promptly of the existence of such other casinghead gas contract.

Phillips/GPM never notified Chevron/Gulf/Pure of any contracts

under which it was purchasing 50% or more of its casinghead gas at a lower price than that specified under the three contracts.

In its findings of fact, the district court noted that the FNCs were bargained for in exchange for the life-of-lease term on the contracts. For example, the GSAU contracts were to be in effect as long as the Goldsmith San Andres Unit was a going concern. The McElroy contract provided that it would be in effect for the life of the lease covering the land described provided that either party could terminate on ten-year anniversary dates. Gulf and Pure would not have entered into the contracts without the FNC.

In March 1961, the Federal Power Commission ("FPC") issued its Orders Nos. 232 and 232-A ("the regs") which stated that FNCs would be of no effect in certain gas contracts.[3] In a 1965 letter of

---

[3] The district court explained the implementation of orders 232 and 232-A on pp.9-13 of its order. In short, the FPC first issued Order 232 (26 F.R. 1983) which stated that all indefinite price escalation clauses shall be inoperative in contracts after March 3, 1961, and it added the following proviso to the end of § 154.93 (18 C.F.R. § 154.93):

> [A]ny provision for a change of prices of the seller by reason of indefinite escalation clauses, as defined in § 154.91 [], contained in a contract for the sale or transportation of natural gas subject to jurisdiction of the Commission tendered for filing on and after April 1, 1961, shall be inoperative and of no effect at law.

On March 31, 1961, Order 232-A amended § 154.93 "to specify the change of price provisions that may be contained in future producer rate schedules submitted for filing with this Commission" by substituting the following for the Order 232 provision above:

> [I]n contracts executed on or after April 3, 1961, for the sale or transportation of natural gas subject to the jurisdiction of the Commission, any provision for a change of price other than the following provisions shall be inoperative and of no effect at law; the permissible provisions for a change in price are:

agreement, Phillips and Gulf memorialized an understanding that the FPC regs would affect a FNC in a different contract filed as a rate schedule; however, no such understanding was reached or memorialized regarding a similar contract filed as a percentage sales contract (like those at issue in this case). The district court concluded that the FNCs at issue in these three contracts were not invalidated by the FPC regs, as suggested by GPM. According to the district court, the industry applied the regs invalidating FNCs only to those contracts that would be required to be filed with the FPC as rate schedules. Also according to the district court, at the time of contracting, Phillips understood the regs to not apply to the contracts at issue. We note that the anti-FNC orders upon which GPM relies in this case were repealed effective July 28, 1994, as a result of the Natural Gas Wellhead Decontrol Act of 1989, Pub. L. No. 101-60, 103 Stat. 159 (1989). *See* 59 Fed. Reg. 40240 (1994).

Chevron first developed its present claim in 1996, when it was

---

(1) provisions that change a price on order to reimburse the seller for all or any part of the changes in production, severance, or gathering taxes levied upon the seller;
(2) provisions that change a price to a specific amount at a definite date; and
(3) provisions that, once in five-year contract periods during which there is no provision for a change in price to a specific amount, change a price at a definite date by a price-redetermination based upon and not higher than a producer rate or producer rates which are subject to the jurisdiction of the Commission, are not in issue in suspension or certificate proceedings, and are in the area of the price in question.

looking into building its own processing plant for the gas coming out of new $CO_2$ injection projects in the McElroy and Goldsmith San Andres Units. GPM contends that Chevron began looking for a way to get leverage that it could use against GPM in discussions to get the contracts released, since those contracts requiring that the gas be sold to GPM were an obstacle to Chevron's new plans. Chevron contended that it received a proposed replacement contract from GPM during discussions of the new $CO_2$ project, which proposal required Chevron to waive all claims under the FNCs, and this raised a red flag. Upon further investigation, Chevron decided it did not want to waive its FNC claims of which it was previously unaware. Chevron sought information from GPM about its other contracts since GPM had never before notified Chevron nor any of its predecessors that GPM was getting more than 50% of its casinghead gas at a higher price than Chevron was receiving. GPM refused to cooperate in providing information about its other contracts for casinghead gas. Chevron and GPM entered into a tolling agreement whereby the parties agreed that any applicable statute of limitations on FNC claims was tolled as of January 23, 1997.

Chevron tried this lawsuit on one issue: that is, that GPM and its predecessors had violated the FNCs in the contracts by failing to offer Chevron an option in May 1992 to sell its gas under the price terms of the highest-priced contract GPM then had for the purchase of casinghead gas at its Goldsmith gas processing plant.

6

Part of Chevron's claim included the allegation that the McElroy contract FNC also applied to gas delivered from the Adamc-Devonian unit. GPM argued primarily that the FNCs were unenforceable as a result of FPC Orders 232 and 232-A, and that in any event, the UCC's four-year statute of limitations barred recovery. Chevron countered that the statute of limitations is inapplicable because the breaches were continuous, because GPM failed to comply with its duty to notify Chevron of the triggering of the FNCs, and because the discovery rule and/or the doctrine of fraudulent concealment deferred accrual of the statute of limitations.

The district court agreed with Chevron, and specifically found as follows:

1. The FNCs are valid and not void under FPC Order Nos. 232, 232-A, nor are they void for indefiniteness;

2. The McElroy FNC is applicable to gas from the Adamc-Devonian Unit;

3. The FNCs were triggered, giving proper consideration to quality of gas and conditions of delivery;

4. GPM breached the FNCs by failing to notify Chevron about the trigger and failing to offer Chevron the option of electing to receive a higher price for its gas;

5. Chevron suffered quantifiable damages as a result of GPM's breach; and

6. Chevron's claims are not time barred.

## III.

Appellant GPM challenges all aspects of the district court's judgment and findings, while Chevron challenges only the district

7

court's alleged error in interpreting the FNCs to require the weighted average pricing methodology for calculating damages. Except for GPM's challenge to the district court's appointment of a technical advisor, which is reviewed for an abuse of district, GPM's issues are legal ones, subject to de novo review.

We have now conducted a thorough review of the record of this case and the issues presented by both parties. Based thereupon, in conjunction with our consideration of the parties' respective briefs, and with the benefit of oral argument, we conclude that the district court committed no reversible error. Accordingly, the judgment entered by the district court in favor of Chevron is affirmed in all respects.

**AFFIRMED.**